UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

KAREN RENEE HOWELL, No. 288305    )
    )
v.    )        NO. 2:06-CV-108
    )
REUBEN HODGE, Warden    )

## <u>MEMORANDUM OPINION</u>

In 1998, in the Greene County Criminal Court, Karen Renee Howell pled guilty to, and was convicted of, three counts of felony first-degree murder, one count of attempted first-degree murder, two counts of especially aggravated kidnapping, two counts of aggravated kidnapping, and one count of theft over $1,000. Those convictions arose out of the murder of Vidar Lillelid, his wife Delphina Lillelid, and their six-year-old daughter Tabitha and the attempted murder of their two-year-old son Peter. Now serving, *inter alia*, three consecutive life sentences without the possibility of parole, Howell brings this petition for a federal writ of habeas corpus under 28 U.S.C. § 2254, challenging the legality of her confinement. [Doc. 1].

Respondent warden has filed an answer, maintaining that the state courts considered and resolved all grounds raised in Howell's petition and that its resulting

decisions must remain undisturbed under the deferential review standards in 28 U.S.C. 2254(d). In support of those arguments, the Warden has submitted copies of the state court record, [Doc. 16, Addenda Nos. 1-15; Doc. 39], Howell argues that, under a totality-of- circumstances test, her guilty pleas were constitutionally unacceptable, that the state court's credibility determinations and other findings of fact are not entitled to a presumption of correctness, and that the state supreme court employed the wrong standard in concluding that her attorney's deficient performance did not prejudice the defense. Because the Court agrees with respondent, this petition will be **DENIED**.

## I. <u>Procedural History</u>

Following her conviction and sentencing, petitioner unsuccessfully pursued direct review. *State v. Howell*, 34 S.W.3d 484 (Tenn. Crim. App.), *perm. app. denied* (Tenn. 2000), *cert. den. sub nom.*, *Sturgill v. Tennessee*,[1] 532 U.S. 977 (2001). She then sought post-conviction relief, but her claims were rejected both by the trial court and the Tennessee Court of Criminal Appeals, *Howell v. State*, 2005 WL 394552 (Tenn. Crim. App. Feb. 15, 2005), and, ultimately, by the state supreme court. *Howell v. State*, 185 S.W. 3d 319 (Tenn. 2006). Petitioner now brings this instant petition for habeas corpus relief, asserting four grounds for relief.

---

[1]    On direct appeal to the Tennessee courts, the last name of this defendant was spelled "Sturgall." *See*, *infra* at 3.

## II.  **Factual Background**

The following factual recitation is taken from the Tennessee Supreme Court's opinion during petitioner's post-conviction appeal.

On April 6, 1997, Howell and her co-defendants, Natasha Cornett, Crystal Sturgall, Joseph Risner, Dean Mullins, and Jason Bryant, planned a trip from their homes in Pikeville, Kentucky, to New Orleans, Louisiana. At the time, Howell was seventeen years old; Bryant was fourteen years old; and each of the remaining co-defendants was at least eighteen years old.  Prior to leaving Kentucky in Risner's vehicle, Howell and her co-defendants secured a nine millimeter handgun, a .25 caliber handgun, and cash.  While en route, they discussed the possibility of stealing a vehicle due to the poor condition of Risner's vehicle.

At a rest stop on Interstate 81 near Greeneville, Tennessee, Mr. Lillelid, a Jehovah's Witness, approached Howell and her co-defendants at a picnic table and began discussing his religious views.  At some point, Risner displayed one of the firearms and said, "I hate to do you this way, but we are going to have to take you with us for your van."  Risner directed the Lillelid family to their van even though Mr. Lillelid offered the group his keys and wallet in exchange for allowing the family to remain at the rest area.

Mr. Lillelid drove the van, and Risner, who was still armed, sat in the passenger seat.  Howell, Bryant, and Cornett also rode in the van with the Lillelids.  Mullins and Sturgall followed in Risner's vehicle.  Mrs. Lillelid began singing in an attempt to console the crying children, and Bryant ordered her to stop.  Risner subsequently directed Mr. Lillelid to a secluded road and ordered him to stop the van.  Once outside the van, all four members of the Lillelid family were shot multiple times.  Bryant claimed that Risner and Mullins were the shooters, but Howell and her remaining co-defendants maintained that Bryant was the shooter.  As Risner drove Howell and her co-defendants from the scene, the van struck one or more of the victims.

Howell and her co-defendants were apprehended in Arizona after failing to cross the border into Mexico. At the time of their arrests, Howell and several of her co-defendants had personal items belonging to the Lillelids in their possession.

The State offered Howell and her co-defendants a "package plea offer" whereby the State would not seek the death penalty against the four adult co-defendants if Howell and all of her co-defendants agreed to enter guilty pleas to the offenses. The plea offer provided for concurrent sentences of twenty-five years for each conviction of especially aggravated kidnapping, twelve years for each aggravated kidnapping conviction, and four years for the theft conviction. The trial court would determine the sentences for the felony murder and attempted first degree murder convictions.

Howell and her co-defendants accepted the State's offer. Following a sentencing hearing, the trial court sentenced Howell to life without the possibility of parole for each of the three felony murder convictions and twenty-five years for the attempted murder conviction. The trial court ordered that each sentence be served consecutively. The Court of Criminal Appeals affirmed Howell's sentences on appeal.

*Howell v. State,* 185 S.W.3d 319, 325 (Tenn. 2006) (footnote and citation omitted).


III. **Standards of Review**

Under the Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA"), decisions of the state courts are reviewed pursuant to 28 U.S.C. § 2254(d), which limits a federal district court's jurisdiction to examine habeas claims on the merits. For example, a court considering a habeas claim must defer to any decision by a state court concerning that claim unless the state court's judgment (1) resulted in a decision that was contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C.§ 2254(d)(1) and (2).

A state court's decision is "contrary to" federal law when it arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or resolves a case differently on a set of facts that cannot be distinguished materially from those upon which the precedent was decided. *Williams v. Taylor*, 529 U.S. 362, 413 (2000). An "unreasonable application" of federal law occurs when the state court decision correctly identifies the governing legal rule in Supreme Court cases but unreasonably applies or unreasonably refuses to extend that principle to the particular facts of the case. *See id.* at 413; *Ramdass v. Angelone*, 530 U.S. 156, 166 (2000). The habeas court is to determine only whether the state court's decision is objectively reasonable, not whether, in the habeas court's view, it is incorrect or wrong. *Williams,* 529 U.S. at 411.

Also, state court factual findings are to be presumed correct unless a petitioner offers clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). And, while "deference does not imply abandonment or abdication of judicial review," *Miller-El v. Cockrell*, 537 U.S. 322, 324 (2003), the highly deferential standard

dictated by § 2254(d) mandates that state courts' decisions "be given the benefit of the doubt." *Bell v. Cone,* 543 U.S. 447, 455 (2005) (citations omitted). Because all grounds raised in this federal petition were adjudicated first in the state courts, they will be examined under the above standards.

IV. **Discussion**

Three of petitioner's claims attack the constitutional validity of her guilty pleas and have been grouped together for ease of discussion.

A. *Guilty Pleas.*

In the first of these claims, petitioner maintains that her guilty pleas were accepted at the same time as her co-defendants, in violation of constitutional principles (Ground One). Next, she asserts that the group plea colloquy lacks, *inter alia*, individualized questioning and, thus, results in a record devoid of the "affirmative showing" necessary to prove that her guilty pleas are voluntary and intelligent (Ground Two). Petitioner's final contention in this set of claims is that the "package deal" plea agreement was unduly coercive and, therefore, constitutionally defective (Ground Three).

1. Group Pleas.

In support of this claim, petitioner presents the allegations of fact which follow. Petitioner's pleas and the pleas of her co-defendants were received at the same time.

Since all six defendants pled guilty as a group, the trial court failed to question her individually and to apply heightened scrutiny, which by law and common sense must be applied to such pleas. She maintains that the trial judge "bunched all six defendants up before him, asking them group questions and receiving group responses from all six over fifty times." (Pet., Attach. 1, Ground One).

As circumstances to be considered in determining the legal legitimacy of her pleas, petitioner cites to her low I.Q., her severe depression, her difficulty in attending to information orally presented, and her attention and other mental deficits—which would have made it very hard for her to understand the court's questions and explanations and to enter valid pleas even if she had been questioned individually. Other flaws to which she points in the group pleas are that she felt compelled to enter the guilty pleas to save the lives of her four adult co-defendants, that she had a mistaken impression, drawn from both her attorney and the trial court's plea colloquy, that the pleas were in her best interest, and that, by pleading "blind" (i.e., without an agreed upon sentence) and consenting to let the court sentence her for the first degree murders, concurrent life sentences with parole might be imposed.[2]

_____

[2] Petitioner has discussed each claim individually, but has incorporated allegations tied to the other claims into each individual discussion. This meshing of allegations has required the Court to disconnect arguments not part of the claim under discussion and reconnect them to the claim to which they relate. For example, in the midst of petitioner's discussion of the group plea claim (Ground

When petitioner attacked the manner in which her pleas were entered in her discretionary post-conviction appeal to the state supreme court, Tennessee's highest court cited to Supreme Court cases, including *Boykin v. Alabama*, 395 U.S. 238 (1969), and *North Carolina v. Alford*, 400 U.S. 25 (1970), and several state court cases as well. Among the latter cases was *Blankenship v. State*, 858 S.W.2d 897, 903 (Tenn. 1993), which itself had cited to *Boykin* and its progeny as containing the legal principles which govern the validity of guilty pleas. The state supreme court indicated that it had previously announced that *en masse* guilty plea hearings violate state law, but had since determined that substantial compliance with *Boykin* and state law is sufficient. All that is really needed, it said, is for the trial court to convey:

> "the entire litany of rights and other required information to multiple defendants in the presence of their respective attorneys, so long as the number involved is not so great as to make individual understanding

_____

One), she cites to *United States v. Usher*, 703 F.2d 956 (6th Cir. 1983), and to *United States v. Gonalez-Vazquez*, 219 F.3d 37 (1st Cir. 2000), both of which concern package deal cases (Ground Three). Likewise, arguments offered as support for the group plea claim are blended with arguments linked to the package plea claim. *See:* Pet. Attach. No. 1, Ground One at ¶ 1 ("Petitioner . . . was compelled by the State's 'group plea offer' to enter pleas of guilty to all charges in order to save the lives of four of her co-defendants, see Ground Three below."). The Court recognizes that some overlap, perhaps, is unavoidable since no matter how guilty pleas are accepted by a court (the group plea claim); the nature of the plea agreement upon which they are obtained (the package plea claim); or the completeness of the guilty plea transcript (the affirmative showing claim), the pleas must pass the same "voluntary and intelligent" test described in the *Boykin* family of cases.

unlikely; and provided that each defendant is addressed individually to establish on the record the understanding and agreement of each defendant."

*Howell v. State*, 185 S.W.3d 319, 332 (Tenn. 2006) (some citations and internal punctuation marks omitted).

Concluding that group guilty pleas were not *per se* violations of federal or state law, the Tennessee Supreme Court then turned to the issue of whether petitioner understood her pleas and the pleas' consequences. To perform this task, the state court examined the plea transcript. Its examination revealed that, at the sentencing hearing, the trial judge questioned petitioner both individually and as a member of the group, that "[a]ll defendants answered affirmatively" or that "[a]ll defendants answered negatively" when the trial court asked each question of the group, and that, when any single defendant's answer differed from that of the group, that specific defendant was identified in the transcript and his or her individual answer followed. Those portions of the transcript established, according to the state supreme court, that petitioner answered each question understandingly.

The highest state court then selected particular parts of the transcript to illustrate that the nature of the plea proceeding was not coercive and that it did not induce petitioner's pleas. It pointed to the section where petitioner and her co-defendants were asked whether they had consumed alcohol or drugs within the past twenty-four hours and where, in response, petitioner along with co-defendants Risner, Cornett,

Mullins, and Bryant answered negatively, while co-defendant Sturgill gave an affirmative answer and an explanation. This showed, according to the state supreme court, that Howell was aware that her answers need not match those of the group and that each defendant would be permitted to explain if an answer differed from the answers of the group. The state supreme court eventually determined that the group plea scenario did not render petitioner's pleas involuntary or unknowing.

Nor did the highest state court modify its conclusion based on testimony at the post-conviction hearing given by two psychologists, who stated that petitioner could not comprehend the events of the plea hearing, had difficulty concentrating on the information presented to her and was unable to understand the questions the trial court asked, and that, due to her "mental and emotional state . . . was sufficiently impaired that her entering the plea was not in a knowing and voluntary fashion." (Addendum 7, vol. 2 at 126). The state supreme court pointed out that the post-conviction court had not accredited these experts' testimonies and also observed that one of petitioner's experts had stated that petitioner's low I.Q. of 78 did not affect her ability to enter a knowing and voluntary guilty plea. He had further acknowledged that she did not have primary mental retardation, that she was aware of the nature of the proceedings, and that she was able to assist her attorney in preparing her defense. Trial counsel, likewise, testified that Howell had been able to assist him and also stated that he had

engaged in extensive conversations with his client involving every aspect and consequence of the plea agreement, discussed all the charges with her, including lesser-included offenses, possible sentences, consecutive and concurrent sentencing, mitigation evidence, the questions that the trial court would pose to her during the plea hearing, and all the rights she would waive by pleading guilty. The trial judge accredited petitioner's lawyer's testimony and the state supreme court found that the record sustained the lower court's credibility findings. Ultimately, Tennessee's highest court ruled that petitioner had not shown how the group plea violated *Boykin* or how it coerced her into pleading guilty. It did not grant relief.

In the seminal Supreme Court case on guilty pleas, the Supreme Court observed that "[a] plea of guilty is more than a confession which admits that the accused did various acts; it is itself a conviction; nothing remains but to give judgment and determine punishment." *Boykin*, 395 U.S. at 242. Because of the substantial consequences flowing from a plea of guilty and to ensure that a plea is voluntary and knowing, a trial court must ascertain, prior to accepting such a plea, whether a defendant understands that she is waiving three separate rights—the right to a trial by jury, the right to confront her accusers, and the privilege against self-incrimination. *Id.* at 243-44.

Whether a plea is constitutionally permissible depends upon the particular facts of each case, but it is essential that a defendant be sufficiently aware of the relevant circumstances and the probable and direct consequences of her plea, *Brady v. United States*, 397 U.S. 742, 748-49 (1979), and that the plea represents "a voluntary and intelligent choice among available alternatives." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). Finally, a waiver of the *Boykin* rights cannot be presumed from a silent record. *Boykin*, 395 U.S. at 243.

As noted, the highest state court cited the relevant Supreme Court precedents (the *Boykin* line of cases) before concluding that, under the legal principles in those precedents, the circumstances, as reflected in the record, showed that petitioner was informed of her rights, that she voluntarily and knowingly surrendered those rights, and that she entered constitutionally valid guilty pleas. Petitioner has not cited to any well established rule in a Supreme Court case which holds that a group plea in and of itself violates the Constitution, and this Court knows of none. Thus, the state supreme court's holding that a group plea is not a *per se* violation of the Constitution is not contrary to the pertinent Supreme Court precedents.

By the same token, the state supreme court, which combed the plea transcript and delved into the facts in petitioner's case, did not unreasonably apply the legal rule in those cases by finding that petitioner had not shown that the manner in which her

plea was taken violated *Boykin* or coerced her into pleading guilty. Nor was the denial of the group plea claim based on an unreasonable determination of facts placed before the state supreme court. Though Howell maintains that the trial court's plea colloquy, *inter alia*, gave her the mistaken impression that, by pleading guilty, without an agreed upon sentence, and letting the trial court sentence her, she might receive concurrent life sentences with parole possible, this claim is a nonstarter. As the Sixth Circuit has commented:

> If we were to rely on [petitioner]'s alleged subjective impression rather than the record, we would be rendering the plea colloquy process meaningless, for any convict who alleges that he believed the plea bargain was different from that outlined in the record could withdraw his plea, despite his own statements during the plea colloquy (which he now argues were untruthful) indicating the opposite. This we will not do, for the plea colloquy process exists in part to prevent petitioners . . . from making the precise claim that is today before us. "[W]here the court has scrupulously followed the required procedure, the defendant is bound by his statements in response to that court's inquiry."

*Ramos v. Rogers*, 170 F.3d 560, 566 (6th Cir. 1999). Petitioner was asked individually if she was pleading guilty because she was guilty and she responded affirmatively, indicating that she was pleading guilty because she was guilty. Petitioner's subjective impression concerning her possible sentence cannot overcome the lack of support for such a claim in the record.

Though it might have been advisable to select a different plea acceptance method—one that did not elicit simultaneous responses from all defendants—that

does not suffice under the AEDPA. *See Williams,* 529 U.S. at 411 (A writ may issue if a state court decision is objectively unreasonable, not just incorrect). As it is, because the state court decision was not based on an unreasonable application of the governing law to the facts, this claim does not entitle petitioner to relief.

2. Record Showing.

In the second claim, which is a close companion to the first and third ones, petitioner asserts that the record must affirmatively disclose that a plea is voluntary, knowing, and intelligent. She insists that the record in her case does not make that affirmative showing since: (1) all defendants were questioned simultaneously, (2) the heightened scrutiny required for package deals is lacking, (3) extrinsic evidence at the post-conviction hearing was omitted, and (4) counsel failed to properly prepare his client for the plea colloquy—despite all her mental problems— and to adequately inform her of the dire consequences which would result from her pleas of guilty.

As with the prior claim, this claim also is anchored in *Boykin*, specifically to the comment that a judge who "canvass[es the rights being waived] with the accused to make sure he has a full understanding of what the plea connotes and of its consequence . . . leaves a record adequate for any review that may be later sought." *Boykin*, 395 U.S. at 241. Indeed, the *Boykin* court reversed a state court conviction "because the record does not disclose that the defendant voluntarily and

14

understandingly entered his pleas of guilty." *Id.* at 244 (citation omitted). Petitioner

surmises that had the trial court taken the necessary precautions when engaging in the

plea colloquy, there would be a record as to whether her pleas were voluntary,

knowing, and intelligent. But, she argues, since it did not employ the special care

called for by the circumstances, there is no record upon which to ascertain the

voluntariness of her pleas.

Sub-claims 1 and 4 (i.e., questioning all defendants at the same time and

inadequate attorney advice) were visited in the previous claim. In resolving the

"simultaneous questioning" sub-claim, the state supreme court determined that the

plea transcript disclosed that petitioner understood her pleas and the consequences of

those pleas and that the post-conviction court's finding that petitioner's attorney had

testified credibly when he stated that he had engaged his client in extensive

conversations concerning every aspect of the plea agreement and its consequences

disposed of the "attorney advice" sub-claim.

Sub-claim 2 alleges that the State failed to present extrinsic evidence at the

post-conviction hearing to satisfy its burden of showing that the guilty pleas are valid.

However, there is no constitutional duty to provide for post-conviction relief since

"[p]ostconviction relief is even further removed from the criminal trial than is

discretionary direct review," as "[i]t is not part of the criminal proceeding itself . . . ."

*Pennsylvania v. Finley*, 481 U.S. 551, 556-57 (1987) (citation omitted). Thus, petitioner's assertions with regard to the adequacy of the State's evidentiary presentation at the post-conviction hearing is not a recognizable habeas corpus claim. *See Kirby v. Dutton*, 794 F.2d 245, 246 (6th Cir. 1986) (finding that claims concerning supposed constitutional violations during post-conviction proceedings did not involve a prisoner's detention and, therefore, were not cognizable under § 2254); *accord, Steele v. Young*, 11 F.3d 1518, 1524 (10th Cir. 1993) (stating that the claim challenging the state postconviction proceedings "would fail to state a federal constitutional claim cognizable in a federal habeas proceeding").

Sub-claim 3, involving heightened scrutiny afforded to package pleas, touches on issues to be addressed in the next claim. However, to the extent that petitioner is resting this assertion on her experts' opinions expressed during her post- conviction hearing that much repetition and explanation would have been necessary before she would have been able to understand her pleas, the trial court did not accredit this testimony. It did, however, accredit her attorney's testimony as to the many steps he had taken to prepare his client to plead guilty and it also relied on evidence in the plea transcript showing that she understood her guilty pleas. Moreover, the validity of a guilty plea depends upon the facts and circumstances of the individual case, *Brady*, 397 U.S. at 749, and not on any formulaic recitation. *See Armstrong v. Egeler*, 563

F.2d 796, 799 (6th Cir. 1977) ("[W]e nevertheless are unwilling to hold, as a constitutional requirement applicable in habeas corpus cases to state prosecutions, that a guilty plea requires any precise litany for its accomplishment.")

The record developed in this case, including the plea transcript, is worlds apart from the "silent" record decried in *Boykin*. *Boykin*, 395 U.S. at 243. To the extent that petitioner's "showing in the record" sub-claim was implicitly addressed in the state court's finding that her guilty pleas complied with constitutional requirements (and, clearly, that decision could not have been reached had the record been "silent"), the state court's rejection of the claim was not an unreasonable application of the rules spelled out in *Boykin* and its line of cases nor was it based on an unreasonable determination of the facts presented to the state courts.

3. <u>Package Plea Agreement</u>.

In her last claim in this category, petitioner asserts that the prosecution's package plea offer was improper because it was conditioned upon the acceptance of the same offer by all her co-defendants, who were also her friends.[3] Petitioner

---

[3] The precise terms of the offer were that, in exchange for petitioner's guilty pleas to three counts of first degree murder and one count of attempted first degree murder, the State would dismiss its request for the death penalty as to the four adult defendants, with sentencing on the murder counts "strictly within the sound discretion of the trial court upon the record . . . generate[d] in a full sentencing hearing." Also, the deadline for acceptance of the offer was Friday, February 20, 1998—two days after it was extended. (Addendum 6, vol. 1 at 150-51).

characterizes the offer extended to her by the prosecution as the equivalent to having a revolver pointed at the heads of her co-defendants to induce her to accept the package plea. Petitioner maintains that, with the trial three days away, she was told that all other defendants had accepted the offer and that the entire deal hinged on her decision as to whether to accept or reject the plea agreement—a decision which she had to make posthaste.

Also, petitioner correctly argues that she could not have received a worse sentence than she received had she rejected the offer and chosen a jury trial. She concludes, therefore, that she derived no benefit in exchange for her pleas of guilty, aside from the withdrawal of the death penalty request for her adult co-defendants, and that offering this "all or nothing" package plea, under the circumstances in her case, is *per se* unconstitutional and a violation of due process.

This claim was resolved by the state supreme court in the following fashion:

The issue before this Court is whether the practice of offering package pleas is so coercive that it renders the resulting guilty plea involuntary. A practice that is coercive or renders a plea involuntary is one that creates improper pressure that likely would overbear the will of innocent people causing them to plead guilty. We do not believe that the nature of a package plea agreement is such that it is likely to overbear the will of an innocent person and cause the person to plead guilty. A guilty plea entered to avoid the possibility of a death penalty may be valid. Even in circumstances in which a defendant enters a plea to avoid facing the death penalty but continues to maintain his innocence, the plea is valid as long as the record contains adequate evidence of guilt. We . . . observe that [s]ince a defendant's plea is not rendered involuntary

because he enters it to save himself [from the death penalty], it is difficult to see why the law should not permit the defendant to negotiate a plea that confers a similar benefit on others . . . . We . . . hold that package plea agreements are not invalid per se.

*Howell*, 185 S.W.3d at 333-34 (all citations and quotation marks omitted)

Recognizing that a package plea may subject a defendant to pressure to plead guilty by a co-defendant who believes that he will benefit from a plea agreement or that it may give a defendant a chance to game the system (i.e., she could withdraw her plea after her co-defendants have received the promised benefit), the Tennessee Supreme Court described the safeguards which are imposed to ensure the integrity of a guilty plea.

First, the State must act in good faith when, as part of a plea deal to a defendant, it offers leniency toward a third party. In petitioner's case, the state court found that the prosecution had acted in good faith since there existed probable cause to charge the adult co-defendants and evidence to establish several aggravating circumstances to support capital sentences in their cases. (Indeed, these aggravating circumstances were applied by the trial judge in fixing the sentences of life without parole for those co-defendants.) The Tennessee court reasoned that the State was entitled either to prosecute the adults fully—including a request for death sentences—or to offer to forego its legally authorized pursuit of the death penalty, in exchange for the guilty pleas of petitioner and her co-defendants.

Another safeguard to which the state supreme court pointed is that, before a plea colloguy, "[t]he nature and terms of the package plea agreement must be disclosed to the trial court." *Howell*, 185 S.W. 3d at 335. This was done in petitioner's case: The record showed that the trial court knew the nature and the terms of the plea agreement.

Petitioner makes much of the lack of benefit she received as a result of the package plea deal. The post-conviction court, however, found that petitioner entered into the guilty pleas, in part, to save her four adult co-defendants from the death penalty and also to avert the agony of a trial, especially for her family, whom she asked to leave the courtroom before she testified at the sentencing hearing. By entering guilty pleas, petitioner achieved that which she desired. None of her adult co-defendants received capital sentences and her family was not exposed at trial to the wrenching factual details of the offenses for which Howell was charged. Also, as the state supreme court explained, "[t]he validity of a plea . . . may not be collaterally attacked merely on the basis that the [petitioner] made, in retrospect, what turned out to be a poor deal." *Howell*, 185 S.W.3d at 337.

The Tennessee Court of Criminal Appeals' ruling that "package deals" are not constitutionally prohibited is by no means contrary to, or an unreasonable application of, federal law. While the United States Supreme Court has indicated that a plea offer

which promises adverse or lenient treatment of some person other than the accused poses a greater danger of inducing a false guilty plea, *Bordenkircher v. Hayes*, 434 U.S. 357, 364 n. 8 (1978), it has not found such an offer to be unconstitutional *per se*. And it is worth noting that many federal courts of appeal have upheld pleas that were induced by such deals. *See*: *United States v. Vest*, 125 F.3d 676 (8th Cir. 1997); *Politte v. United States*, 852 F.2d 924 (7th Cir. 1988); *Martin v. Kemp*, 760 F.2d 1244 (11th Cir. 1985); *United States v. Diaz*, 733 F.2d 371 (5th Cir. 1984); and, from our own circuit, *United States v. Usher,* 703 F.2d 956 (6th Cir. 1983), and *Cornett v. Lindamood*, 203 Fed. Appx. 691, 2006 WL 3006496 (6th Cir. Oct. 20, 2006) (unpublished disposition).[4]

B. *Ineffective Assistance*.

According to Howell, her appointed attorney, David Leonard, gave her ineffective assistance in both the juvenile and criminal courts. Mr. Leonard, so claims petitioner, had only three years experience in the practice of law and limited experience in representing clients in juvenile court proceedings and in criminal cases. Petitioner charges Mr. Leonard with the shortcomings which follow.

1. Juvenile Court.

---

[4] The appellant in *Cornett v. Lindamood* was one of petitioner's adult co-defendants, but she likewise was unsuccessful in asserting, in her habeas corpus petition, that the package plea offer violated the Constitution.

In the juvenile proceedings, petitioner claims that Mr. Leonard failed to raise a mental defense to prevent her transfer to the criminal court to be tried as an adult. She accuses Attorney Leonard with failing to have her evaluated prior to the transfer hearing, even though the juvenile court had ordered that to be done. His inattention to this matter, she insists, prevented him from discovering that she was involuntarily committable to an institution for the mentally retarded or mentally ill. Petitioner maintains that, under state juvenile law, the presentation of a defense psychologist's report at the transfer hearing, diagnosing her as depressed and suicidal, should have forestalled the juvenile court from transferring her to the criminal court.

The Tennessee Supreme Court reviewed petitioner's's claims regarding the representation rendered her by her counsel during the juvenile proceedings. Under Tennessee's juvenile law, a juvenile court must transfer a juvenile to criminal court to be tried as an adult, *inter alia*, if the juvenile court finds reasonable grounds to believe that the child: (1) committed the alleged delinquent act, (2) is not committable to an institution for the mentally retarded or mentally ill, and (3) is required, in the interests of the community, to be placed under legal restraint or discipline. *See* Tenn. Code Ann. § 37-1-134(a)(4)(B). The ineffectiveness claim was predicated on the second provision, i.e., whether counsel was deficient in failing to offer evidence that Howell was committable to a mental health facility

The state supreme court began its analysis by focusing on the testimony offered at the evidentiary hearing, observing that counsel had testified that he had made a tactical decision not to offer evidence at the transfer hearing to show that his client was committable to an institution for the mentally ill. Mr. Leonard testified that, prior to the transfer hearing, he talked with Dr. Miller, a clinical psychologist with expertise in juvenile transfer hearings, and asked him to conduct a mental evaluation of Howell. Counsel recalled that Dr. Miller had conveyed his disillusionment with the juvenile justice system and had said that the real battle would be in criminal court. Counsel testified that he had become convinced that this was so based on his own research and review of the circumstances in petitioner's case, including her age (17, turning 18 in a few months), and that, consequently, he decided to use the transfer hearing as a discovery tool. Mr. Leonard informed Dr. Miller that Dr. Larkin, a psychologist employed by the State, had examined Howell and had determined that she was not committable and that she met the standards for transfer to criminal court.

Dr. Miller testified as well, stating that he told counsel that he was willing to evaluate petitioner, but that counsel gave him no further directions prior to the transfer hearing. Counsel offered "strategy" as a reason for this too—he had determined to delay Dr. Miller's evaluation as long as possible so that, if the findings raised a possible defense, the State would have little time in which to counter it. Another

feature of his trial strategy, counsel testified, was to present petitioner as separate from the group who had committed the crimes and to keep the co-defendants unaware that she would be evaluated.

The state supreme court concluded that, based upon its review of the record, including the transcript of the transfer hearing, counsel had performed outside professional guidelines because the strategy he had described during the post-conviction hearings was contradicted by his actions before and during the transfer hearing.  Counsel's original strategy was to avoid the transfer and he had written Dr. Miller a letter to this effect.  Later, counsel said that he decided to delay the evaluation to prevent the State from learning about any mental infirmities from which Howell possibly might suffer.  Yet, at the transfer hearing, counsel's partner, who was serving as co-counsel, told the juvenile court that he had informed the state that, possibly, Howell was committable to a mental institution.  When the State's psychiatrist, Dr. Larkin, arrived (earlier in the hearing, an instanter subpoena had been issued to secure his testimony), Howell's counsel advised the juvenile court that his client was abandoning her claim of committability and the subpoena was withdrawn.

From its review of the transcript, the state supreme court found that petitioner's attorneys fought their client's transfer, did not use the transfer hearing as a way to obtain discovery, and did not abandon the fight until the transfer hearing was

underway. The Tennessee Supreme Court ruled that counsel's performance was deficient during the juvenile transfer proceedings—a ruling with which Howell agrees. She disagrees, however, with the state supreme court's determination that counsel's failings were not prejudicial, claiming that its conclusion rested on an apparently non-existent report by a state psychiatrist, which neither the judge nor the attorneys ever saw.

The state supreme court explained that the decision as to the prejudice component of *Strickland* would depend upon whether counsel's error affected petitioner's transferability. In other words, prejudice would exist if the juvenile court would have found reasonable grounds to believe that petitioner was committable to a mental institution, had counsel arranged for Dr. Miller to evaluate his client before the transfer hearing and presented his report at the hearing. In order to make that determination, the highest state court explored the facts in the record.

Dr. Miller evaluated Howell, after the transfer hearing, and wrote a report setting out the results. In the report, Dr. Miller diagnosed petitioner as having bipolar disorder, with psychotic features, and post-traumatic stress disorder [hereinafter PTSD]. Attorney Leonard submitted that report at the sentencing hearing. Later, at the post-conviction hearing, Dr. Miller testified that it was his opinion that, at the time

of the transfer hearing, Howell had depression and was involuntarily committable to a mental facility, due to her "suicidality" and "the psychotic element,"

The post-conviction court found that certain details in Dr. Miller's report refuted his testimony concerning whether Howell was committable to a mental institution. These details included Dr. Miller's observations that petitioner was alert, lucid and oriented, that she was verbal and spontaneous, that she demonstrated balanced affect throughout, that she did not demonstrate signs or overt symptoms of anxiety or depression, that she was not suffering from primary mental retardation, that she had the potential to function within the average range of intelligence, and that, while she showed signs of PTSD, those signs were insufficient to warrant that diagnosis. Too, the post-conviction court noted that Dr. Miller had not found petitioner to be incompetent or insane.

Howell also presented the testimony of Dr. Pamela Auble, a clinical neuropsychologist who had performed a mental examination of petitioner in July of 2002, and who had reviewed Dr. Miller's report in preparation for the post-conviction hearing. Dr. Auble testified that she did not doubt Dr. Miller's findings and diagnosis, but that her evaluation indicated that Howell no longer suffered from depression, though she continued to suffer from PTSD. The post-conviction court refused to accredit Dr. Miller's testimony involving whether Howell was committable to a

mental health facility at the relevant time due to the inconsistencies between his testimony and the contents of his report. Likewise, it found Dr. Auble's testimony regarding Howell's committability not to be credible since her conclusions were based on Dr. Miller's report.

The state supreme court held that the evidence in the record supported the post-conviction court's findings regarding inconsistencies in Dr. Miller's report and the testimonial credibility of both experts. It then concluded that, even absent the attorney error, the juvenile court would not have had reasonable grounds to believe that petitioner was not commitable to a mental health institution, given the inconsistencies in Dr. Miller's report and Dr. Larkin's diametrical finding that Howell was not committable. Finally, Tennessee's highest court determined that, since Howell had failed to show that she was prejudiced from her counsel's deficient performance, relief was unwarranted.

The two-prong legal rule governing a claim of ineffective assistance is found in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Williams*, 529 U.S. at 390 (holding that *Strickland* "squarely govern[s]" such claims). To establish such a claim, a petitioner must show that counsel's performance was deficient and that it was prejudicial to the defense, so as to render the trial unfair and the result unreliable. *Id.* at 687. A reviewing court's scrutiny of counsel's performance is highly deferential.

*Id*. at 694. To demonstrate deficient performance, a petitioner must show that his counsel's representation fell below an objective standard of reasonableness on the facts of the particular case, viewed as of the time of counsel's conduct. *Id.* at 688, 693-94. In the context of a guilty plea, as here, a petitioner must demonstrate that there is a reasonable probability that, but for her attorney's unprofessional errors, she would not have pled guilty, but would have insisted on standing trial. *Hill v. Lockhart*, 474 U.S. 52, 58 (1985). Unless there is a likelihood of a successful defense to the charge, no alleged error by counsel is a basis for relief. *Id.* at 59.

In considering petitioner's claim of ineffective assistance, the Tennessee Supreme Court cited to *Strickland* and *Hill* for the legal principles governing such claims. Since the controlling legal rules from Supreme Court decisions were cited and applied, the state court's decision was not "contrary to" clearly established federal law as determined by the Supreme Court.

This finding is unaffected by petitioner's argument that the state supreme court used the wrong standard in assessing prejudice. She relies, for her position, on a single sentence in the state supreme court's opinion, which reads: "Accordingly, Howell has failed to establish prejudice by clear and convincing evidence." *Howell*, 185 S.W.3d at 330. Petitioner fails to explain, however, that the offending sentence was followed by a citation to Tenn. Code Ann. § 40-30-210(f)(1997) (now § 40-30-

110(f) (2003).  That statute involves post-conviction hearings and provides that a "petitioner must prove all factual allegations contained in his post-conviction petition by clear and convincing evidence."  *See also Johnson v. State*, 145 S.W.3d 97, 117 (Tenn. Crim. App. 2004).  The "clear and convincing" evidence rule is drawn from state law and applies to *factual* allegations—not *legal* determinations, such as whether there is a reasonable probability that an outcome would be different.  Moreover, the state supreme court began its discussion of the claim of ineffective assistance by setting out the correct standard for such claims.  The opinion states:

> In a case involving a guilty plea, a petitioner who is seeking to establish that a deficiency resulted in prejudice must demonstrate that there is a reasonable probability that, but for counsel's error, he would not have pleaded guilty and would have insisted on going to trial. A reasonable probability is defined as a probability that sufficiently undermines confidence in the outcome.

*Howell*, 185 S.W.3d at 328-29 (internal citations and quotation marks omitted).  As authority for this standard, the state court cited to *Hill* and *Strickland*.

Everything depends on context and, taken in context, this claim of prejudice was adjudicated pursuant to the appropriate legal rules in Supreme Court cases and was not contrary to Supreme Court precedents.  *See, e.g., Woodford v. Visciotti* 537 U.S. 19, 23-24(2002) (finding that a state court's use of the word "probable," when the complete *Strickland* standard was recited elsewhere, is permissible shorthand for "reasonable probability").

Since neither party contests the state court's finding of deficient performance, the issue is whether the state court unreasonably applied *Strickland* in deciding that any deficiency of performance did not result in prejudice.

Before beginning the analysis of this issue, there is one matter to be addressed—petitioner's question as to whether the Larkin report even exists since it is not in the state court record. While the Court was unable to locate Dr. Larkin's report in the record, the post-conviction court found: "The state psychologist had filed a report concluding that the petitioner was not committable and that the petitioner met the standards for transfer." (Addendum 6, vol. 3 at 465). The appellate court found no reason to disagree. A state court's factual determinations are entitled to deference and, absent any clear and convincing evidence to the contrary, will be presumed correct. *Benge v. Johnson*, 474 F.3d 236, 241 (6th Cir. 2007).

Furthermore, according to the transcript of the transfer hearing, the juvenile judge, after being advised by the State's attorney that the report was in the court file, asked the Clerk to make copies of the report and to provide those copies to the parties. (Addendum 7, vol. 5 at 11-12). And, Attorney Leonard testified during the post-conviction hearing that he had "in [his] possession at one time" the Larkin report, which contained Dr. Larkin's conclusion that Howell was "noncommittable." (Addendum 7, vol. 3 at 259). References to this report or to Dr. Larkin's findings are

contained in other parts of the record as well.  (Addendum 7, vol. 1 at 16-18, 75; vol. 3 at 259; vol. 4 at 299, 301-05, 308).  It is clear, from these portions of the state court record, that the Larkin report existed and that Howell's counsel knew of its existence and its contents.

Because the outcome of this claim depends, in large part, on the state court's credibility determinations, the Court must examine Dr. Miller's report and testimony offered by each of Howell's experts at the post-conviction hearing.  At that hearing, Dr. Miller stated that, to keep juveniles in juvenile court and prevent their transfer to criminal court, it must be shown, *inter alia*, "that they are mentally retarded or that they are suffering from a severe enough emotional disturbance to require institutionalization."  (*Id*. at 32).  He testified that, while he found no primary mental retardation as a result of Howell's three session evaluation in January, 1998, he did find that she had "suicidal levels of depression and/or an impairment of [her] thinking," that these disorders were present at the time of her transfer hearing, and that she would have been committable to a mental institution, due to "the suicidality and the psychotic element."  (*Id.* at 43, 64 - 66).

But Dr. Miller also agreed, during cross examination, that he had found Howell competent and not suffering from delusions, that he had told Attorney Leonard that "it was quite difficult to avoid a transfer," and that, based on his own experience, the

defense's fight is really in criminal court. (*Id*. at 74-76, 79). And, he acknowledged that the chart notes he had taken on March 3, 1998, the last time he had seen petitioner, did not mention that she was suicidal, psychotic, suffered a diminished capacity, or was incapable of fully comprehending matters that were so dramatically affecting her life. (*Id*. at 85-86). However, Dr. Miller also stated that, during the evaluation, he discovered that Howell had attempted suicide on four occasions, prior to her incarceration. (*Id*. at 66).

Dr. Pamela Auble, a clinical neuropsychologist, also gave Howell a mental examination in July of 2001. She too testified at the post-conviction hearing on her client's behalf. (Addendum 7, vol. 2 at 101-31). Dr. Auble stated that she had reviewed Dr. Miller's records and psychological test data and that she had no reason to doubt the correctness of his diagnosis and report. (*Id*. at 105,116). This expert then observed that, at the time of the transfer hearing, Howell "certainly seemed very significantly depressed . . . with suicidal tendencies." (*Id*. at 116). Dr. Auble found that Howell no longer suffered from depression or anxiety, though she still exhibited symptoms of PTSD, which is an anxiety disorder, and had other deficits including memory, concentration, verbal knowledge base, verbal reasoning, language, and a low I.Q. (*Id*. at 104, 112-13,122).

On issues of credibility in habeas corpus cases, this Court looks to the Supreme Court's decision in *Miller-El v. Dretke*, 545 U.S. 231 (2005). There, the petitioner challenged a state court's finding that a prosecutor's race neutral explanations were true—a finding which was used to reject his *Batson* claim.[5] *Id*. at 240. The Supreme Court observed that, under the AEDPA, relief would be warranted if the petitioner could show that the state court finding was "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" but that factual findings would be presumed to be correct, unless he rebutted it by clear and convincing evidence. *Ibid.* (citing to 28 U.S.C. § 2244(d)(2) and § 2244(e)(1)). The petitioner was granted relief given the Supreme Court's conclusion that the cumulative evidence in the record was " too powerful to conclude anything but discrimination." *Id.* at 265.

In Howell's case, the post-conviction court discredited the testimony of Howell's two experts—the first one because his testimony was inconsistent with his report and the second one because she had relied upon the first expert's report for her opinion.[6] The adjudication of the claim of prejudice also rested on the post-conviction

---

[5]  *Batson v. Kentucky*, 476 U.S. 79 (1986), held that a prosecutor violates equal protection by using racial discrimination when selecting a defendant's jury.

[6]  In this Court's opinion, these professionals were exceptionally well qualified, experienced, and able, and, in contrast to the thirty-minute mental evaluation by the State's expert, performed extensive psychological evaluations, based on testing, record reviews, and interviews lasting, respectively, 13.5 hours

court's determination that Dr. Larkin's report contained the opposite finding as to petitioner's committability. The evidence summarized above is far from being "too powerful to conclude anything but" that there were reasonable grounds to believe that Howell was committable to a facility for the mentally ill. Moreover, she has not shown, clearly and convincingly, that her mental condition was such as to meet the criteria for involuntary committal.

The First Circuit, dealing with the same issue, aptly explained:

[Petitioner]'s argument boils down to restating that two parties-he and his attorney-provided differing versions of events. In such a case, "the state trial judge's implicit credibility determinations, adopted by [an appellate court], are exactly the type of factual determinations to which we defer, at least short of any indication of serious error." *Teti v. Bender,* 507 F.3d 50, 59 (1st Cir. 2007)( *citing Rice v. Collins,* 546 U.S. 333, 341-42, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006)). No more need be said about [petitioner]'s futile argument.

*Glacken v. Dickhaut*, 585 F.3d 547, 552 (1st Cir. 2009). The same thing is true of the state court's credibility findings here, except, in Howell's case, there is even more reason for deference. The post-conviction court's credibility determinations were *explicit*.

Given the state court's credibility findings regarding these two experts, the report by the State's expert, which determined that petitioner could not be committed

---

(Dr. Miller) and 9.75 hours (Dr. Auble). (Addendum 7, vol. 1 at 43; vol. 2 at 104).

involuntarily to a psychiatric facility, and the state court's reasoning which supports its conclusion of "no prejudice," the state court's adjudication of this claim of ineffectiveness did not result from an unreasonable application of *Strickland* and was not founded on an unreasonable factual determination in light of the evidence adduced in the state court proceedings. No writ will issue on the claim.

2. <u>Criminal Court</u>.

The next set of ineffective assistance claims involve counsel's alleged errors during the criminal court proceedings.

a. *Failure to Advise (aggravating factors)*: Howell first asserts that her attorney failed to tell her that, once she admitted to several aggravating circumstances by means of her multiple pleas to first degree felony murder, she would not and could not expect to receive any consideration for her guilty pleas during sentencing. She further asserts that Mr. Leonard failed to advise her about the effect aggravating circumstances would have on her sentence. She claims that he told her, instead, that she would have a better chance if she pled guilty to all charges and let the judge sentence her.

b. *Failure to Investigate (law of felony murder)*: Also, according to petitioner, Mr. Leonard did not investigate the law and the facts and was unfamiliar with felony murder law, as shown in his appellate brief. Her argument, as the Court understands

it, is that Attorney Leonard did not understand the significance of a guilty plea to first degree felony murder—the "significance" being that she was acknowledging responsibility for the acts of the shooter and, at the same time, several aggravating circumstances which led to her three consecutive life sentences.

Apparently, Howell combined these two sub-claims in her state court pleadings. During her post-conviction appeal to the Tennessee Court of Criminal Appeals, Howell argued

> that in pleading guilty to three counts of first degree murder, she "branded herself" a dangerous felon and admitted to three aggravating circumstances, thereby giving the sentencing court the authority to impose three consecutive sentences of life imprisonment without the possibility of parole. She contends that "[n]o defendant with a proper knowledge and understanding of this fact would have voluntarily entered a guilty plea," because she "had a chance of being convicted of lesser included offenses" had she chosen instead to go to trial. More emphatically, she declares that "[i]t is impossible to believe that a defendant in [her] position would have entered a guilty plea and submitted herself to a life sentence had she fully understood her situation or had the coercion involved with the package deal not been present." This argument is a reiteration of the Defendant's basic one: that she had nothing to lose by going to trial, and nothing to gain by pleading guilty. Therefore, we should *ipso facto* find her plea involuntary, unknowing, and constitutionally invalid.

*Howell*, 2005 WL 394552, at*28.

The state appellate court considered Howell's allegations, but pointed out that she made the decision to plead guilty and that whether she made the same choice as

someone else would have made was irrelevant. The Court of Criminal Appeals declined to assess petitioner's guilty plea on the basis of what "no" defendant would have done, given a full understanding of the plea, noting simply that a defendant's "blind" plea to the highest possible crime may be valid. The pertinent inquiry, the intermediate state court declared, was whether, before Howell pled guilty, she had been informed of the nature of the charges against her and of the consequences of her pleas and whether she understood the information being conveyed. It ultimately determined that Howell's contentions lacked merit.

c. *Failure to Advise (probable defense/lesser offense)*: Another alleged attorney error to which Howell points is counsel's failure to inform her that, based upon her psychological evaluation which he obtained prior to her guilty pleas, she had a probable defense of "diminished responsibility," and that this defense should be further investigated. When this claim was offered to the Court of Criminal Appeals for disposition, it related that, while Howell testified that her lawyer did not speak to her about a "diminished capacity defense" and Dr. Miller testified that he did not investigate Howell's state of mind at the time of the crime, Attorney Leonard testified that he did investigate such a defense and discussed it with Dr. Miller. This is another credibility issue resolved by the post-conviction court when it found counsel's testimony credible and Dr. Miller's not credible.

Nor, according to petitioner, did her lawyer explain to her that, if she went to trial, she could be convicted of the lesser offense of facilitation of first degree murder. Howell purports that a proper pre-trial mental evaluation would have established that she lacked the intent to commit either first degree felony murder or premeditated murder. She further contends that, had this proof come to light before her guilty plea, Attorney Leonard would have recognized that she had a good chance of being convicted of facilitation of felony murder at trial and would have counseled her not to plead guilty to the felony murders.

This assertion, as pointed out by the state appellate court, rested on Dr. Auble's testimony that, "at the time of the crime [Howell] was knowing, in that she was aware of what was happening, but she was not–did not have a capacity to participate in it or to stop the proceedings." The intermediate state court deferred to the lower state court's finding that Dr. Auble's testimony was not credible. It also concluded that, even if this proof had been developed earlier and Howell's lawyer had given her the advice she claims he would have, it was unlikely that she would have followed his advice. This was so, according to the state appellate court, because her reasons for pleading guilty were to rescue her co-defendants from a capital sentence, to increase her chances of receiving a lesser sentence, and to save herself from the ordeal of a trial.

The state appellate court concluded that

> [t]he [petitioner] knew that, by pleading guilty, she was giving up any hope that a jury might convict her of lesser offenses. She knew that, by pleading guilty, her potential benefit was limited to a hope that the trial court would be lenient in sentencing her, but that, even so, she would be spending at least fifty-one years in prison. We have no doubt that the [petitioner]'s lawyer did everything in his power to educate the [petitioner] about what she was doing.

*Id.* at *31. Finding that the proof did not support that, but for the purported attorney error, she would not have pled guilty but would have insisted on trial, the Court of Criminal Appeals denied her claim of prejudice .

e. *Failure to Advise (waiver)*: Next, petitioner maintains that counsel did not tell her that, by pleading guilty, she would waive her right to appeal her transfer from juvenile court to criminal court, since no record was generated upon which to base an appeal of her transfer. The state appellate court agreed that counsel's decision to waive the issue of her committability was deficient but went on to find that any attorney error in this regard was irrelevant since her guilty pleas were valid.

f. *Failure to Advise (trial court)*: Mr. Leonard's last purported shortcoming was his failure to reveal Howell's severe mental problems to the trial court, which left it in the dark about the need to individually question petitioner. The issue was carried to the state appellate court, which first agreed that counsel should have told the trial court of Howell's auditory processing problems, then noted that the trial court had

committed an error in conducting the guilty plea hearing with all defendants responding in unison, next found that the error was harmless because the plea was valid and, finally determined that, since the error was harmless, Howell was not prejudiced by counsel's failing. *Howell*, 2005 WL 394552, at * 22, *34. It did not grant her post-conviction relief on the basis that she received ineffective assistance of counsel. *Id*. at *35.

Apparently, one of the errors found was a state law violation, *see* Tenn. R. Crim. P. 11(b)(1) ( providing that a plea accepting court "shall address the defendant personally in open court"), but when the issue was carried to the Tennessee Supreme Court, it held that substantial compliance with the procedural rule would suffice. It then held that there was no error involving the manner in which Howell pled guilty, either under state law or federal constitutional law. *Howell*, 185 S.W.3d at 333. Of course, an error of state law is not a cognizable habeas corpus claim, unless it denies a defendant a fair trial. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991)) ("[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions."). Nothing like a due process violation has been shown here.

As earlier determined, the state court did not unreasonably apply the controlling legal rules in Supreme Court cases in the adjudication of Howell's challenge to the constitutionality of her guilty pleas. Because those guilty pleas were constitutionally

valid and because petitioner has not cited to a Supreme Court case which holds that counsel renders ineffective assistance in connection with the entry of guilty pleas which are not unconstitutional, the state court did not unreasonably apply *Strickland* in rejecting her claims of ineffective assistance. *Knowles v. Mirzayance* 129 S.Ct. 1411, 1419 (2009) ("[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court.") (citations and internal quotation marks omitted). This is especially so with respect to Howell's claim that counsel gave her ineffective assistance in connection with her pleas because she gained nothing by pleading guilty. *Ibid.* ("With no Supreme Court precedent establishing a 'nothing to lose' standard for ineffective-assistance-of-counsel claims, habeas relief cannot be granted pursuant to § 2254(d)(1) based on such a standard").

## V. <u>Conclusion</u>

For the reasons stated above, Howell'spetition will be **DISMISSED**.

## Vi. **Certificate of Appealability**

The Court must now decide whether to issue a certificate of appealability (COA) because an appeal may not be taken from a final order in a § 2254 case unless a "COA" is issued. 28 U.S.C. § 2253(c)(1)(B). Howell qualifies for issuance of a COA if she has made a substantial showing of the denial of a constitutional right; she makes such

a showing by demonstrating that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *Slack v. McDaniel,* 529 U.S. 473, 484 (2000). A petitioner need not show that she will prevail on the merits to be granted a COA, *id.* at 485, nor that ultimate relief is certain, nor even that jurists of reason would agree, after consideration of the claim on its merits, that petitioner cannot prevail. *Miller-El v. Cockrell*, 537 U.S. 322, 337-38 (2003). Finally, determining whether a COA should be granted requires only an overview of a claim's constitutional framework and its merits—not an in-depth examination of the facts and law supporting the claim. *Id.* at 337.

The Court has individually assessed Howell's claims, under the above standards, and will not issue a COA with regard to any of the claims regarding Howell's guilty pleas or ineffective assistance of counsel in the state criminal court. As to the claim involving ineffective assistance in the state juvenile court, the Court believes that the record fully supports that any failure on the part of counsel to secure an expert to evaluate his client before the transfer hearing and to present the results at the hearing did not result in prejudice. After all, that finding was based on the mental evaluation performed on her by the State's expert and the lower state court's credibility determinations of the testimony given by Howell's experts and her attorney.

However, jurists of reason might debate whether the juvenile court would have found reasonable grounds to believe that petitioner was committable to a mental institution, without the attorney error. Introducing evidence to refute the State's position and the state's statutory presumption that Howell was not committable might have persuaded the juvenile court that it had reasonable grounds to find that, indeed, she was committable. Under the AEDPA, even a general standard, such as that which typically is used to decide a claim of ineffective assistance, "may be applied in an unreasonable manner." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). A COA will issue on this claim.

A separate order will enter.


**ENTER**:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE
